J. H. MITCHELL, JR., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mitchell v. Commissioner
Docket No. 4817-71.
United States Tax Court
T.C. Memo 1974-94; 1974 Tax Ct. Memo LEXIS 222; 33 T.C.M. (CCH) 473; T.C.M. (RIA) 74094; April 18, 1974, Filed J. H. Mitchell, Jr., pro se. Alan R. Herson, for the respondent. QUEALY
MEMORANDUM FINDINGS OF FACT AND OPINION QUEALY, Judge: The respondent has determined a liability against the petitioner as transferee of the assets of National Technology, Inc., in the amount of $24,000 plus interest as provided by law on account of an income deficiency of the transferor for the taxable year ended November 30, 1966. The liability of the transferor, determined by respondent to be $87,731.30, is not in dispute. The sole question is whether the petitioner is liable either at law or in equity as a transferee of property of National Technology, Inc., within the meaning of section 6901. [1] *223 Some of the facts have been stipulated by the parties. Such facts and the exhibits attached thereto are incorporated herein by this reference. The legal residence of the petitioner at the time of the filing of the petition was Los Angeles, California. The U.S. Corporation Income Tax Return of National Technology, Inc., for the taxable year ended November 30, 1966, was filed with the district director of internal revenue at Los Angeles, California. National Technology, Inc. (hereinafter referred to as "National" or "transferor"), was incorporated under the laws of the State of California. Although authorized, no stock was ever issued due to difficulties not relevant herein. Petitioner is an attorney in a law firm which acted as legal counsel for the transferor. During and prior to the year in question, petitioner performed legal services for the transferor, with the assistance of an associate in the firm, William F. Raff. In consideration of reduced hourly rates and deferred billing, the transferor agreed to give petitioner an equity interest in the transferor *224 which petitioner and Raff agreed to share 80 percent and 20 percent, respectively. As of 1966, petitioner claimed to have a beneficial interest of 5 percent. Besides petitioner, the other holders of beneficial interest in the transferor were Wayne Copeland, Bertha Mae Copeland, Mutual Equities Capital Corp., and Robert J. Heller. In February of 1968, petitioner was approached by Solomon Eisenrod of Solbar Eastern Corp. (hereinafter referred to as "Solbar"), a New York corporation, for the purpose of acquiring an option to purchase all the beneficial rights which petitioner possessed in the transferor. By an agreement executed at such time, Solbar received an option to purchase all such rights for the sum of $25,000 in consideration for the payment of $500. It was agreed that the option price would be applied to the purchase price if the option was exercised. Under the agreement, petitioner was required to "do all things and execute all further documents required to carry out and effectuate the intent and spirit of this option, if exercised", including the assignment of his interest to Solbar or its nominee or transferee. The option, which was to be exercised in writing, expired *225 September 30, 1968. In acquiring the above option, it was Solbar's intention to seek additional public or private financing for National or alternatively, to arrange for the acquisition of the corporation by purchase, merger, consolidation or reorganization. Solbar apparently acquired similar options from the other holders of beneficial interests in the transferor with the exception of Wayne Copeland. Wayne Copeland was president of the transferor and possessed a 65 percent beneficial interest therein, subject to a claim by his former wife, Bertha Mae Copeland, to one-half of such interest. Solbar acquired an option to purchase her interest in the transferor. A plan of dissolution was adopted by the Board of Directors of the transferor on or about June 25, 1968, and subsequently consented to in writing by Wayne Copeland and Solbar, whom the plan recited were "the ones entitled to the issuance of all the issued and outstanding capital stock * * *." The plan called for the transfer to Solbar, in complete liquidation of the transferor, any cash or assets remaining after the contemplated sale to Omega Equities Corp., a Delaware corporation (hereinafter referred to as "Omega"). *226 On June 26, 1968, Omega entered into a contract with the transferor and with Wayne Copeland and Solbar, as "beneficial owners and stockholders" of the transferor, to purchase all the assets, business and goodwill of the transferor. The total consideration for the sale was $700,000, $530,000 of which was to be paid in cash at the closing and the balance of $170,000 to be paid after December 31, 1968, and on or before January 31, 1969. Petitioner was not involved in either the negotiation or execution of the above agreement. At the closing held on August 14, 1968, the transferor directed that, in partial payment of the $530,000 presently due and owing, Omega issue a check to petitioner and Raff in the amount of $24,000, $4,800 of which was allocable to Raff. The transferor also directed that Omega pay $224,500 to Solbar and $207,500 to Bertha Mae Copeland. The balance of the $530,000 was apparently allocated on the basis of option agreements which Solbar had entered into earlier that year with other holders of beneficial interests in the transferor. The transferor requested that the $170,000 deferred payment take the form of a promissory note payable to Solbar and Wayne Copeland. *227 Petitioner and Raff executed a general release of their rights, excluding however any claims for legal services, against the transferor, Omega, Solbar, and Wayne Copeland. They also executed a document consenting to the sale of the assets to Omega. Both documents represented an attempt by Omega to insulate its ownership against any future claims of persons alleging to have a proprietary interest in the transferor. On his Federal income tax return for 1968, petitioner reported the amounts received from Omega as long-term capital gain. In 1970, respondent mailed a statutory notice of deficiency to the transferor for the fiscal year ended November 30, 1966 in the amount of $87,731.30. The transferor has not paid the deficiency. The insolvency of the transferor as a result of the sale and its subsequent liquidation later that year are not in dispute. In the case of Wayne Copeland, this Court found no transferee liability existed. . Respondent has also conceded transferee liability in the case of Bertha Mae Copeland with respect to the $207,500 she received from Omega pursuant to the sale of the transferor's assets. OPINION
*228 Section 6901(a) provides a procedure whereby the Government can assess income taxes owing from a delinquent taxpayer against a person to whom the taxpayer has transferred his assets in such a manner as to render itself incapable of meeting its own income tax obligations. The liability imposed upon such "transferee of property" may be a result of either an express agreement to assume the obligation of the transferor or an implied obligation existing either in law or in equity. Section 6901(a) does not impose any obligation where none exists either at law or in equity. . Moreover, the burden of proving that transferee liability exists rests on the respondent. Section 6902(a). The insolvency of the transferor as a result of the sale of its assets to Omega is not in dispute. Nor is there any question as to the income tax deficiency assessed against the transferor or the respondent having exhausted his remedies for the collection of the deficiency from the transferor. The sole question before us, therefore, is whether the petitioner is a "transferee of property" from the transferor within the meaning of the statute. The *229 regulations under section 6901 defines the term transferee to include "the shareholder of a dissolved corporation * * *." Section 301.6901-1(b), Proced. & Admin. Regs. Although no stock was ever issued, petitioner does not challenge his status as shareholder in the transferor through his claim to 5 percent beneficial interest therein. Petitioner instead challenges respondent's assertion that the $24,000 check he received from Omega was a liquidating distribution from transferor on the sale of its assets. He contends that the check represents an amount owing from Solbar as a result of the exercise of its option to purchase petitioner's beneficial interest pursuant to their February agreement. Upon careful consideration of the facts, we are convinced that the $24,000 check received by petitioner from Omega was pursuant to the sale of his beneficial interest in the transferor pursuant to their February option agreement and not a liquidating distribution from the sale of the transferor's assets to Omega. Consequently, petitioner cannot be held liable as a "transferee of property" from the transferor within the meaning of section 6901. ; *230 . The fact that the option price for petitioner's interest in the transferor was satisfied by Solbar out of the proceeds from the liquidating sale does not alter the character or nature of such payment. (C.A. 6, 1939). As we view the situation, Solbar purchased an option to acquire petitioner's 5 percent beneficial interest in the transferor for $25,000 in February of 1968. That June, armed with similar options from the other holders of beneficial interests with the exception of Wayne Copeland, Solbar joined with Copeland to negotiate the sale of National's assets to Omega. Although there is no indication that Solbar exercised any of its options at this juncture, including the one with petitioner, it is clear that Solbar was exercising complete control of petitioner's interest as well as over the interests of the other optionors. [2] Indeed, the plan of dissolution adopted just prior to entering into the contract of sale with Omega, called for the transfer to Solbar, in complete liquidation of the transferor, of any cash or assets remaining after the contemplated *231 sale. The plan itself was consented to by only Copeland and Solbar whom the plan recites were "the ones entitled to the issuance of all the issued and outstanding capital stock * * *." From its language and terms, the plan must have contemplated that Solbar would be a shareholder as of the time of the closing, if not before. In view of the above, it is not unreasonable for us to accept petitioner's contention that as of the time of closing, Solbar had exercised its right to purchase petitioner's beneficial interest in the transferor pursuant to the terms of their February agreement. Solbar, then being entitled to at least 5 percent, if not all of the proceeds of the sale, directed by way of the transferor that a check for $24,000 be paid to petitioner out of such proceeds pursuant to his purchase of petitioner's beneficial interest. [3] The fact that Solbar exercised its option orally, instead of by writing as called for by the option agreement, is not a sufficient basis for disbelieving petitioner's contention in this regard. *232 Respondent's claim that the transferor was the one who directed the check to be issued to petitioner as a liquidating distribution is elevating form over substance. The plan of dissolution itself calls for the entire distribution to go to Solbar. Moreover, the amount of the check bears no relationship to the amount to which petitioner would have been entitled had he shared in the proceeds of the sale as the holder of a 5 percent beneficial interest. Our conclusion on this matter is further buttressed by respondent's inability to explain why Solbar received any part of the liquidating distribution if his status was only that of an option holder. The facts indicate that Solbar received $224,500 in cash, some 106,000 stock options in Omega and a note in the amount of $170,000 payable jointly to itself and Copeland. The fact that petitioner executed a general release and a document consenting to the sale of the assets to Omega is not inconsistent with our finding that Solbar had exercised its option as of the time of the closing. Finally, we note that respondent has conceded its case against Bertha Mae Copeland, presumably on the basis that the record in her case supported her *233 contention that the money she received from Omega was pursuant to the sale of her interest to Solbar and was not a liquidating distribution from the transferor. Similarly, we find the record before us sustains petitioner's contention on this issue. In accordance with the above, Decision will be entered for the petitioner. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. ↩
2. The contract of sale also refers to Copeland and Solbar as "the beneficial owners and stockholders" of National. ↩
3. The check was actually made out to the order of petitioner and Raff as a result of their side agreement. In determining the nature of the payment, however, such side agreement is not pertinent. ↩